UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BLUWAV SYSTEMS, LLC,

                                                        CASE NO.  09–13878

        Plaintiff,                              HON. LAWRENCE P. ZATKOFF

v.

EDWARD G. DURNEY,

        Defendant.

_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on November 7, 2011.

PRESENT:  THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court on Plaintiff's Motions for Summary Judgment [dkt 69] and to Preclude Defendant from Further Vexatious Filings [94], and Defendant's Motions to Transfer Case [dkt 85], Vacate Voluntary Dismissal [dkt 86], and Reschedule Pre-Trial Conference [dkt 87].  The Motions have been fully briefed.  The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument.  Therefore, pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that the Motions be resolved on the briefs submitted.  For the reasons set forth below, Plaintiff's Motion for Summary Judgment is GRANTED, and Defendant's Motions to Transfer Case and Vacate Voluntary Dismissal are DENIED.  Plaintiff's

Motion to Preclude Defendant from Further Vexatious filings and Defendant's Motion to Reschedule Pre-Trial Conference are dismissed as moot.

## II. FACTUAL BACKGROUND

### A. OVERVIEW

This case arises out of a written contract entered into by Defendant Edward Durney ("Durney"), a patent attorney, and WaveCrest Laboratories, LLC ("WaveCrest"), a now defunct electric car company once headquartered in Dulles, Virginia. WaveCrest's controlling shareholder was Paperboy Ventures, LLC ("Paperboy"), a Delaware venture capital firm, which later purchased Plaintiff Bluwav Systems, LLC ("Bluwav"), a company that develops components for hybrid and electric cars. The contract in question was a settlement agreement ("Settlement Agreement") intended to resolve litigation then pending between Durney and WaveCrest, and to prevent future litigation between the parties. After WaveCrest granted a security interest in all of its assets to Paperboy, which had purportedly assigned the interest in those assets to Bluwav, the terms in the Settlement Agreement came into dispute between Durney and Bluwav. In October 2008, Bluwav was acquired by Magna Electronics, a subsidiary of Magna International, Inc. ("Magna"), an automotive supplier incorporated and based in Canada. Magna Electronics and Bluwav are Delaware corporations with main offices in Michigan.

### B. DURNEY AND WAVECREST

Durney undertook to consult, draft patents, and develop business for WaveCrest in 2002 and 2003. Although WaveCrest compensated Durney for services performed in 2002, a dispute arose regarding payment for Durney's services performed in 2003. On November 24, 2004, Durney filed a complaint against WaveCrest for breach of contract and unlawful conversion in

2

the U.S. District Court for the Northern District of California ("Northern District of California"), alleging that WaveCrest declined to pay Durney for the patent applications he drafted in 2003, while also converting the applications for its own use (the "2004 Action"). Durney subsequently dismissed the 2004 Action with prejudice in January 2005.

On August 4, 2005, Durney filed another complaint against WaveCrest in the Northern District of California (the "2005 Action"). Durney asserted several claims pertaining to the following U.S. patent applications filed by WaveCrest: 2004/0021437, 2004/0263099, 10/359,293, 2005/0052080, 205/0045392, 2005/0046375, 2005/0127856 (collectively, "Patent Applications"). WaveCrest cross-claimed against Durney in the 2005 Action, alleging breach of contract and promissory fraud. The court in the 2005 Action dismissed all the causes of action listed in Durney's first-amended complaint, except for his breach of contract claim, finding that the dismissed claims were barred by *res judicata*, as Durney's dismissal of the 2004 Action was with prejudice. In July 2006, Durney filed another, separate complaint in the Northern District of California, asserting the same causes of action as the 2004 and 2005 Actions against WaveCrest and Paperboy ("2006 Action"). Durney subsequently dismissed the 2006 Action without prejudice; the 2005 Action remained pending.

### C.  SETTLEMENT AGREEMENT BETWEEN DURNEY AND WAVECREST

In November of 2006, WaveCrest and Durney agreed to settle his remaining claim in the 2005 Action. Pursuant to the Settlement Agreement, Durney agreed to dismiss the 2005 Action and release all claims relating to the 2004, 2005, and 2006 Actions (collectively the "Prior Actions"). Durney also agreed not to initiate any new actions against WaveCrest or its successors or assignees, if such actions relate to or are based on any of the Prior Actions. In return, WaveCrest paid Durney $220,000 and released Durney from the counter-claims WaveCrest

asserted in the 2005 Action, so long as Durney complied with the terms of the Settlement Agreement.

In addition to the $220,000 paid to Durney for releasing all claims related to the Prior Applications, Durney was paid $20,000 in exchange for transferring any interest he retained in the work he performed for WaveCrest, including prior-art references and studies he prepared in the course of his patent work. The Settlement Agreement also contains a liquidated damages provision, stipulating that damages for Durney's breach of the Settlement Agreement would be $220,000, which was the amount paid to Durney in exchange for his release of his claims.[1] Additionally, the Settlement Agreement also sets forth that the prevailing party in any action for breach of the Settlement Agreement is entitled to all litigation costs, including attorney's fees.[2]

Other provisions of the Settlement Agreement affirm that WaveCrest and Durney read the Settlement Agreement carefully, knew and understood its contents, and had made all desired or necessary investigations related to the facts set forth therein. Last, the parties agreed that the Settlement Agreement was a fully integrated contract, and would be governed by California law.

### D. SECURITY AGREEMENT BETWEEN WAVECREST AND PAPERBOY

In July of 2005, WaveCrest obtained funding from Paperboy in the amount of $400,000, for which WaveCrest issued a promissory note. At the same time, WaveCrest also entered into an agreement to secure its indebtedness to Paperboy ("Security Agreement"). Pursuant to the

---

[1] The liquidated damages clause states: "Durney and WaveCrest mutually recognize that the damages resulting from a breach by Durney of this Settlement Agreement would be impracticable or extremely difficult to determine with certainty. Hence, Durney and WaveCrest hereby stipulate that the damages for a breach of this Agreement by Durney shall be $220,000. This amount stipulated to by Durney and WaveCrest represents a reasonable endeavor to ascertain what the damages for a breach might be."

[2] The prevailing party clause states: "The prevailing Party in any action, suit, or other proceeding instituted to remedy, prevent, or obtain relief from a breach of this Settlement Agreement, or arising out of a breach of this [Settlement] Agreement, or arising out of or related to this [Settlement] Agreement, shall recover all of such Party's litigation expenses, including attorneys' fees, incurred in each and every such action, suit, or other proceeding, including any and all appeals or petitions."

Security Agreement, WaveCrest granted a security interest in all its present and future property, assets, and rights (collectively, the "Collateral") to Paperboy.  Between July 2005, and April 2007, WaveCrest issued Paperboy several other secured promissory notes (collectively, "Notes") totaling in excess of $19,000,000.  The Security Agreement provided that, in the event of default by WaveCrest, Paperboy was entitled to all the rights and remedies of a secured party under Delaware's Uniform Commercial Code ("Delaware UCC").[3]

### E.  PAPERBOY'S GENERAL ASSIGNMENT TO BLUWAV

On April 12, 2007, Paperboy executed a General Assignment, by which it transferred and assigned any and all of its rights in the Collateral, Notes, and any other contractual rights and general intangibles to Bluwav.  Additionally, the General Assignment specifically provided for the assignment of the Security Agreement to Bluwav.

### F. DEMAND FOR PAYMENT

On April 12, 2007, after obtaining Paperboy's rights in the Security Agreement, Bluwav made a demand upon WaveCrest for payment of the entire balance of principal and interest outstanding under the Notes as of April 3, 2007.  The total amount owed by WaveCrest at the time was $19,404,431.01.  WaveCrest failed to timely pay the entire outstanding balance to Bluwav in the manner prescribed, which constituted an Event of Default under the Security Agreement.  Upon an Event of Default, Paperboy could seek relief as a secured party under the Delaware UCC.

---

[3] Article 9 of the Delaware UCC provides a means whereby a secured party may accept collateral in full or partial satisfaction of applicable debt without a sale or other disposition of the collateral.  Del. Code Title 6, § 9-101, *et seq*. This mechanism is commonly referred to as "strict foreclosure."  Strict foreclosure may be accomplished by satisfying all of the debt or by satisfying a portion of the debt thus preserving a deficiency claim against the borrower.  Under § 9-620(a), a secured party may effect strict foreclosure and accept collateral in full or partial satisfaction provided the debtor consents to the strict foreclosure.  Strict foreclosure cannot be accomplished without the consent of the debtor, and consent is only effective if it is given after the occurrence of a default.

In accordance with § 9 of the Delaware UCC, Bluwav proposed to satisfy $8,475,000 of WaveCrest's outstanding balance by permitting Bluwav's partial strict foreclosure upon the Collateral.  Bluwav's proposal specifically stated that upon its acceptance, WaveCrest "will remain liable for the deficiency and all of WaveCrest's interest in and to the Collateral will transfer to Bluwav."  WaveCrest accepted Bluwav's proposal to satisfy a portion of the debt by strict foreclosure on the Collateral, as set forth in a letter dated April 17, 2007.

### H.  2009 ACTION BY DURNEY

On March 27, 2009, Durney filed suit in the Northern District of California against Magna, Bluwav and Paperboy (the "2009 Action").[4]  Durney's claims against Bluwav were for Copyright Infringement, Correction of Patent Inventorship and Failure to Maintain Jointly-Owned Property, all of which regarded the Patent Applications.

On August 22, 2009, Bluwav was granted leave in the Northern District of California to file a motion to dismiss.  In its request for leave, Bluwav alluded that Durney's complaint was an attempt to litigate claims precluded by the terms of the Settlement Agreement.  Following Bluwav's motion for leave, Durney dismissed Bluwav from the 2009 Action. The dismissal was without prejudice, and Durney had indicated in supplemental filings with the court that he may again attempt to bring his related Patent Application claims against Bluwav at a later date.

On October 1, 2009, Bluwav filed suit in this Court, claiming that Durney violated the Settlement Agreement by commencing the 2009 Action, and seeking relief as a successor to the Settlement Agreement.

### III.  MOTION TO TRANSFER

---

[4] The named Plaintiff in this Action was A Truly Electric Car Company ("ATECC"), a company owned by Durney. Durney was ATECC's attorney, chief executive officer and sole director.  According to Durney, ATECC's sole place of business and all of its records were located in Durney's home.  Further, ATECC has never produced an income statement or filed a tax return, and maintains no bank account.  Durney was the sole person involved in the decision to commence the 2009 Action.  Thus, the Court finds that Durney and ATECC are one and the same with respect to the commencement of the 2009 Action.

The Court will first consider Durney's Motion to Transfer this case to the Northern District of California. Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." "[A] district court 'has broad discretion to grant or deny [a] motion to transfer a case.'" *Phelps v. McClellan*, 30 F.3d 658, 663 (6th Cir. 1994) (quoting *Cote v. Wadel*, 796 F.2d 981, 985 (7th Cir. 1986)). The Court must give deference to the plaintiff's choice of forum, which is not disturbed "unless the balance is strongly in favor of the defendant." *Stewart v. Dow Chem. Co.*, 865 F.2d 103, 106 (6th Cir. 1989) (citing *Gulf Oil Co. v. Gilbert*, 330 U.S. 501, 508–09 (1947)). The moving party bears the burden of showing, by a preponderance of the evidence that a change of venue is warranted. *Amphion, Inc. v. Buckeye Elec. Co.*, 285 F. Supp. 2d 943, 946 (E.D. Mich. 2003).

This is Durney's second Motion to Transfer this case to the Northern District of California. Durney filed his first Motion to Transfer on November 23, 2009, and that Motion became fully briefed on December 12, 2009. On March 26, 2010, Defendant filed a Notice of Withdrawal of his Motion to Transfer, stating that "[t]his case does not stand in this Court only. Three other courts are involved . . . . Events in those other lawsuits have overtaken this case, making the issues raised in my motions largely moot. To save the Court from having to spend the time and resources to rule on my motions, I hereby withdraw, without prejudice, my motion . . . to transfer venue." Durney subsequently filed the instant Motion to Transfer on September 24, 2011.

The Court finds that Durney has failed to satisfy his burden of proving, by a preponderance of the evidence, that transfer is appropriate, especially when considering the deference that must be given to Bluwav's choice of forum. *See Dow Chem. Co.*, 865 F.2d at

106.  This case was filed with the Court more than two years ago.  Discovery ceased over six months ago, after which Bluwav filed its Motion for Summary Judgment.  Durney's second Motion to Transfer has neither raised any new or novel issues in support of transfer, nor any issue that he was unaware of or was prevented from raising prior to the Court investing significant resources in this case.   Notwithstanding the resources already invested in this case, transfer to the Northern District of California would require a court in that district to expend even more resources to become familiar with and ultimately adjudicate the case.   As such, the Court finds that the interests of justice and judicial economy would be best served by this Court's retention of the case.  Accordingly, Durney's Motion to Transfer is DENIED.

## IV. MOTION TO VACATE VOLUNTARY DISMISSAL

The Court turns next to Durney's Motion to vacate his voluntary dismissal of his third-party complaint [dkt 33] filed against Magna, which was filed on June 10, 2010.  Durney voluntarily dismissed the third-party complaint on September 27, 2010—the second time Durney had dismissed these claims against Magna.  On December 9, 2009, Durney also dismissed the same claims against Magna in the 2009 Action.  Thus, Durney's voluntary dismissal of Magna in this case constitutes an adjudication on the merits.  *See* Fed. R. Civ. P. 41(a)(1)(b).  Under the principle of *res judicata*, an adjudication on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.  *Allen v. McCurry*, 449 U.S. 90, 94 (1980).  Durney does not dispute that his voluntary dismissal in this case was an adjudication on the merits subject to *res judicata*.  Rather, Durney argues that the Court should vacate his voluntary dismissal because *res judicata* would preclude him and his company (ATECC) from pursuing the same claim against Magna in a different court.

8

Upon a party's motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief

Fed. R. Civ. P. 60(b).  A party seeking to set aside a dismissal under Rule 60(b) bears the burden of establishing the grounds for such relief by clear and convincing evidence.  *Info-hold, Inc. v. Sound Merchandising, Inc.*, 538 F.3d 448, 454 (6th Cir. 2008).  Further, a movant seeking relief under Rule 60(b)(6)—the so called "catch-all" provision—must show "extraordinary circumstances" to justify the vacating of a final judgment.  *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005).

Although Durney relies on Fed. R. Civ. P. 60(b), he acknowledges that his "reasons for vacating the dismissal do not fit cleanly into any of the six specific [reasons] outlined in . . . Rule [60(b)]."  Nevertheless, Durney argues that his personal oversight and strategic misjudgment are grounds to vacate his voluntary dismissal, and that doing so would promote "justice and fair play," since he "had no idea that [voluntarily dismissing the Third-Party Complaint] might imperil [ATECC's] case against Magna" in state court.

The Court finds Durney's argument unpersuasive.  First, the Court is not swayed by Durney's argument that "his client," ATECC, would be prevented from pursuing its claims against Magna in a different court.  From Durney's own deposition statements, "this case has nothing to do with ATECC . . . .  We're here about *Bluwav v. Durney*, not *ATECC v. Magna*."

Second, Durney is not entitled to have his dismissal vacated simply because of his mistakes, inadvertence or neglect, as claims of attorney error and legal malpractice do not merit relief under Rule 60(b)(1).  *See McCurry v. Adventist Health Systems/Sunbelt, Inc.*, 298 F.3d 586, 593 (6th Cir. 2002) (holding that while strategic misjudgments and flawed legal analysis by counsel may be aptly termed "mistakes," they are not the sort of "mistakes" that warrant relief under Rule 60(b)(1)).  Additionally, neither Durney's strategic miscalculation nor his misinterpretation of the law warrants relief from a judgment because "a Rule 60(b) motion may not be used 'as a technique to avoid the consequences of decisions deliberately made yet later revealed to be unwise.'" *Id.* at 593–94 (quoting *Hopper v. Euclid Manor Nursing Home, Inc.*, 867 F.2d 291, 294 (6th Cir. 1989) and citing *FHC Equities, L.L.C., v. MBL Life Assurance Corp.*, 188 F.3d 678, 683–87 (6th Cir. 1999)).  As such, Durney's tactical mistakes are insufficient grounds to vacate his previous voluntary dismissal of Magna.

Last, the Court takes notice of what appears to be a thinly-veiled attempt by Durney to assign blame for his strategic miscalculations.   According to Durney:

> I called up the Court's chambers to ask if withdrawing the motions would be improper. I spoke . . . to a man, who listened to my question as to whether my withdrawing the motions would be improper, and said 'No, not at all.' So I withdrew the motions.

By including the above statement, Durney seems to imply that he only withdrew the Motion after having been told that doing so would not be "improper."  Durney's reasons for including this alleged discussion with the Court staff are questionable, and possibly even disingenuous to the

10

Court.  As an attorney, especially one acting on his own behalf, it was Durney's sole responsibility to know the consequences of voluntarily dismissing his claim against Magna.  For these reasons, Durney's Motion to Vacate Voluntary Dismissal is DENIED.

### V. MOTION FOR SUMMARY JUDGMENT

#### A. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").  A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party. *Celotex*, 477 U.S. at 323.  The moving party discharges its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving

11

party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B. ANALYSIS

Bluwav contends that it was entitled to WaveCrest's rights in the Settlement Agreement, and that Durney breached the Settlement Agreement by filing the 2009 Action against Bluwav and Paperboy.   Durney argues that Plaintiff is not entitled to WaveCrest's rights in the Settlement Agreement, and, alternatively, that even if Plaintiff was entitled to such rights, Durney's actions in the 2009 Action did not amount to a breach.  Durney further argues that any purported breach was immediately cured when he dismissed Bluwav from the 2009 Action on August 22, 2009.

As an initial matter, the Court first notes that Durney's brief is simply devoid of specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *See also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).  When he does make a citation to facts, he does so in a footnote directing the Court to refer to his "declaration" offered in support of his since-terminated motion for summary judgment.   Durney merely cites to his own statements,

essentially supporting the baseless assertions in his response brief with the baseless assertions in his "declaration."

Moreover, rather than making proper citations, Durney directs the Court to voluminous sections of the record, noting that "those hundreds of pages contain evidence that puts the basic facts of this case squarely in dispute." Durney fails to consider that, with respect to motions for summary judgment, the non-moving party *must* cite specific portions of the record in opposition to the moving party, and the Court is not required to search the record for evidence that may preclude summary judgment. Fed. R. Civ. P. 56(c), (e); *See also U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191 (6th Cir. 1997). As a result, it would be entirely within the Court's discretion to rely solely on the facts presented by Bluwav in deciding the instant motion. *See Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). Notwithstanding Durney's failures, the Court has nevertheless examined "those hundreds of pages" and will accordingly address the merits of Durney's claims. The Court finds that, for the reasons discussed below, Durney's claims are insufficient to create a genuine issue for trial.

**1. WAVECREST'S RIGHTS IN THE SETTLEMENT AGREEMENT**

WaveCrest attained certain rights in the Settlement Agreement coinciding with Durney's accession to certain obligations. First, Durney agreed to a full, final, and complete release of all claims against WaveCrest, its successors and assignees:

> Durney . . . hereby forever *releases and discharges WaveCrest*, Paperboy and Andersson, and all of their past or present direct or indirect parents, subsidiaries, brother-sister and affiliated corporations, predecessors, successors, assignees, officers, employees, attorneys or other representatives of any kind (collectively 'Releasees'), from any and all claims, demands, liabilities, obligations, liens, promises, agreements, costs and expenses (including but not limited to attorneys' fees), damages, and causes of action, of whatever kind or nature, in law, equity or otherwise, whether known or unknown, suspected or unsuspected, fixed or contingent, apparent or concealed, whether or not reduced to judgment, *relating*

13

> *to any and all subject matters*, including but not limited to *all claims asserted in* [*the Prior Actions*.]

(emphasis added). Durney also covenanted never to institute litigation against WaveCrest related to any of the claims released in the Settlement Agreement, including the Prior Actions:

> Durney covenants and agrees (which covenants and agreements are expressly made in consideration for $220,000 of the total payment to him of $240,000 (see §1 above)) that he will:
>
> (a) *never commence, assist in any way, prosecute or cause, permit or advise to be commenced or prosecuted* against [WaveCrest] any action or proceeding based on or related to any [of the Prior Actions.]

(emphasis added). Thus, the Settlement Agreement grants WaveCrest the right to be free from any past, present, or future claims by Durney related to the Prior Actions.

Next, Durney also granted WaveCrest any of the rights related to the work-product he produced while employed by WaveCrest:

> Within 10 days of the execution of this Settlement Agreement by both Parties, **Durney will** (i) dismiss the **2005 Action** with prejudice, (ii) **deliver to WaveCrest's counsel all prior-art references or studies that Durney prepared for WaveCrest,** and (iii) **transfer to WaveCrest** any and **all right, title or interest that Durney may have, may have had, or may contend that he has, in and to any of the work which he performed or attempted to perform for WaveCrest.**

(emphasis added). Thus, in addition to the right to be free from any litigation by Durney related to the Patent Applications, WaveCrest also obtained any right that Durney may have had to the Patent Applications themselves, as well as any right related to any of the work Durney performed for WaveCrest (collectively, the "Settlement Rights"). Last, Durney even acknowledged during a deposition that WaveCrest had the right to enforce the Settlement Agreement, and that, if Bluwav was the successor-in-interest or successor to WaveCrest, Bluwav would then obtain that

right.  Accordingly, the Court now examines Bluwav's eventual succession to the Settlement Rights via Paperboy.

### 2.  PAPERBOY ACQUIRED WAVECREST'S RIGHTS IN THE SETTLEMENT AGREEMENT

Prior to entering into the Settlement Agreement with Durney, WaveCrest executed a Security Agreement with Paperboy, WaveCrest's controlling shareholder at that time.  The Security Agreement was executed to secure WaveCrest's indebtedness to Paperboy.   As part of the Security Agreement, WaveCrest assigned Paperboy a security interest in all of WaveCrest's "**assets and rights**, . . . wherever located, **whether now owned or hereafter acquired or arising**, and all proceeds and products thereof . . . ." (emphasis added).   As WaveCrest's Settlement Rights are an asset to which certain rights are attached, the Security Agreement clearly grants Paperboy a security interest in the Settlement Rights.  More specifically, however, the Security Agreement expressly grants Paperboy a security interest in certain other collateral (the "Collateral"), as that term is defined in the Security Agreement:

> [WaveCrest] hereby grants to [Paperboy] . . . a security interest in the following  . . . 'Collateral' . . .
>
> All personal and fixture property of every kind, . . . **contract rights**, rights to the payment of money, . . . documents, instruments, . . . all general intangibles[,] . . . and . . . agreements of any kind or nature pursuant to which [WaveCrest] possesses, uses or has authority to possess.

(emphasis added).   Because the Settlement Agreement itself was a contract, *see Estate of Thottam*, 165 Cal. App. 4th 1331, 1340 (Cal. Ct. App. 2008), and WaveCrest clearly granted Paperboy all contract rights, WaveCrest granted Paperboy the Settlement Rights, as well as all future contract rights.

According to the Security Agreement, Paperboy, as WaveCrest's secured creditor, was entitled to all of the rights granted by the Delaware UCC to secured creditors.  One such right

granted by the Delaware UCC is "strict foreclosure."  Strict foreclosure is "a procedure by which the secured party acquires the debtor's interest in the collateral without the need for a sale or other disposition." *See* Del. Code Ann. tit. 6, § 9–620.  Pursuant to § 9–620 of the Delaware UCC, with the consent of the debtor, a creditor may effect a strict foreclosure by accepting the collateral of the debtor in full or partial satisfaction of a debt obligation. *Id*.  Paperboy had a security interest in WaveCrest's Settlement Rights, and thus a right to strictly foreclose on the Settlement Rights in the event of WaveCrest's default.

### 3. PAPERBOY ASSIGNED ITS RIGHTS AS A SECURED CREDITOR TO BLUWAV

On April 12, 2007, Paperboy executed a General Assignment to Bluwav, stating that Paperboy:

> hereby sells, transfers, assigns, delivers, sets-over and conveys without recourse, to Bluwav . . . all right, title and interest of [Paperboy] in and to each of those Secured Demand Promissory Notes . . . given by WaveCrest . . . to [Paperboy] . . . including without limitation all of [Paperboy's] rights, title and interest in all . . . contract rights . . . ***including without limitation that certain Security Agreement*** between [WaveCrest] and [Paperboy] dated July 14, 2005.

(emphasis added).   Therefore, pursuant to the General Assignment, Paperboy assigned its security interest in the Settlement Rights to Bluwav.  As such, the General Assignment gave Bluwav the right to strictly foreclose on all of WaveCrest's assets (including the Settlement Rights) in the event of its default.

### 4. BLUWAV'S STRICT FORECLOSURE

On April 12, 2007, Bluwav made a demand for payment from WaveCrest, seeking the entire balance outstanding under the Notes as of April 3, 2007.  The total amount owed by WaveCrest at the time was $19,404,431.01. WaveCrest failed to timely pay the entire outstanding balance to Bluwav in the manner prescribed, which constituted an Event of Default under the Security Agreement.  In accordance with § 9 of the Delaware UCC, Bluwav proposed

16

to satisfy $8,475,000 of WaveCrest's outstanding balance by Bluwav's partial strict foreclosure upon the Collateral.  Bluwav's proposal specifically stated that upon WaveCrest's acceptance, it "will remain liable for the deficiency and all of WaveCrest's interest in and to the Collateral will transfer to Bluwav."  WaveCrest accepted Bluwav's proposal to satisfy a portion of the debt by strict foreclosure on the Collateral, as set forth in a letter dated April 17, 2007.

Bluwav's strict foreclosure on all of WaveCrest's assets and rights ultimately vested in Bluwav the Settlement Rights, which included: the right to the Patent Applications, the right to any work performed by Durney for WaveCrest, and the right to be free from any claims by Durney related to the Patent Applications or any of the Prior Actions.  Bluwav was thus the ultimate successor to WaveCrest with respect to the Settlement Agreement with Durney.

Having found that Bluwav does in fact possess the Settlement Rights, the Court now turns to the question of whether Durney breached the Settlement Agreement, thereby triggering its liquidated damages and prevailing party clauses.

### 5. BREACH OF THE SETTLEMENT AGREEMENT

A settlement agreement provision for the "release of all claims and causes of action must be given comprehensive scope."  *Villacres v. ABM Indust. Inc.*, 189 Cal. App. 4th 562, 589 (Cal. Ct. App. 2010) (internal quotations omitted).  Were courts to do otherwise "it would be virtually impossible to create a general release that actually achieved its literal purpose, and language releasing all claims would be inherently misleading, causing unfair surprise to parties that offer payment on the reasonable expectation that all claims are settled, only later to face continuing litigation." *Id.*

Here, the Settlement Agreement clearly indicates that Durney had released WaveCrest and its successors and assignees from any claims asserted in the the Prior Actions:

17

> Upon execution of this Agreement . . . Durney, . . . his . . . successors and assignees, hereby **_forever releases and discharges_** WaveCrest, Paperboy and Andersson, and all of their . . . **_successors, assignees_**, . . . or other representatives of any kind (collectively 'Releasees'), **_from any and all claims_**, demands, liabilities, obligations, liens, promises, agreements, costs and expenses (including but not limited to attorneys' fees), damages, and causes of action, of **_whatever kind or nature_**, in law, equity or otherwise, whether known or unknown, suspected or unsuspected, fixed or contingent, apparent or concealed, whether or not reduced to judgment, **_relating to any and all subject matters, including but not limited to all claims asserted in the 2004 Action, the 2005 Action and/or the 2006 Action_** (collectively, the 'Claims').

More significant, the Settlement Agreement specifically precludes Durney from even *commencing* any claim against WaveCrest and its successors or assignees if such claim relates to the Prior Actions:

> Durney covenants and agrees . . . in consideration for $220,000 . . . that he will:
>
> (a) never **_commence_**, assist in any way, prosecute or cause, permit or advise to be commenced or prosecuted against [WaveCrest, Paperboy, or their successors or assignees] **_any action or proceeding based on or related to any_** [**_Prior Action._**]

(emphasis added).

The Court finds that Durney breached the Settlement Agreement upon commencing the 2009 Action against Bluwav. First, as determined in the preceding section, Bluwav was a successor to WaveCrest and was thus entitled to the Settlement Rights. Next, not only did the 2009 Action involve claims "related to" the Prior Actions, but at least three of those claims were more or less exact restatements of claims made in the 2005 and 2006 Actions—all of which pertained to the Patent Applications.[5] Reading the Settlement Agreement with the requisite comprehensive scope, *see Villacres*, 189 Cal. App. 4th at 589, the Court finds that Durney's claims in the 2009 Action are sufficiently "related to" the Prior Actions. Therefore, no genuine

---

[5] The 2005 and 2006 Actions listed Durney as Plaintiff and the 2009 Action Plaintiff was ATECC. As noted, Durney was solely responsible for ATECC's decision to file the 2009 Action and acted on its behalf throughout. *See supra*, n. 4.

issue of material fact remains to dispute that, upon commencing the 2009 Action, Durney breached the Settlement Agreement.

**6. DAMAGES**

A cause of action for a breach of contract comprises the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff. *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1367 (Cal. Ct. App. 2010) (quotations omitted).

Durney admits that he signed the Settlement Agreement, and that the Settlement Agreement was a valid and binding contract entered into between him and WaveCrest, satisfying the first element of *Durell*.  The second element was satisfied upon WaveCrest's payment of $220,000 to Durney as consideration for Durney's release.  With respect to the third element, the Court's preceding analysis showed that Durney breached the terms of the Settlement Agreement. Thus, the final inquiry for the Court regards the question of damages.  To that end, the Court examines the relevant portions of the Settlement Agreement—the liquidated damages and prevailing party clauses.

### *i. Liquidated Damages*

A provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances at the time the contract was made. Cal. Civ. Code §1671(b).  The burden of proving that the clause is unreasonable at the time the contract was made is placed on the party opposing the liquidated damages clause. *See Radisson Hotels Int'l, Inc. v. Majestic Towers, Inc.*, 488 F. Supp. 2d 953, 959 (C.D. Cal. 2007).  This standard permits a considerable degree of latitude in fixing the sum of liquidated damages.  *See id*.  A liquidated

damages clause becomes an unenforceable penalty only if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from the breach. *See id.* (quotations omitted).

Here, the amount agreed to by the parties as liquidated damages constituted a reasonable effort to anticipate actual damages in the event of Durney's breach. At the time the Settlement Agreement was executed, it was impracticable to determine WaveCrest's actual losses in the event of Durney's breach of the Settlement Agreement. Such a breach could conceivably cause an indeterminable amount of harm to WaveCrest's reputation and goodwill and result in indeterminable expenses in having to defend against additional lawsuits related to the Prior Actions. Moreover, it would be impossible to determine WaveCrest's actual loss in paying Durney consideration for his releases under the Settlement Agreement as opposed to WaveCrest defending, and possibly prevailing in, the 2005 Action. The Settlement Agreement makes clear the parties' understanding that if WaveCrest or its successors and assignees were to lose the benefit of their bargain, WaveCrest or its successors and assignees would be entitled to a return of the consideration paid for the bargain—$220,000.  There is nothing patently unreasonable about requiring Durney to pay back money he received as consideration for performing certain obligations if he failed to perform such obligations.  Consequently, the $220,000 liquidated damages amount was a reasonable attempt to anticipate the range of WaveCrest's actual losses that would flow from Durney's breach of the Settlement Agreement.

Durney argues that "a jury might decide" that the amount of liquidated damages is a penalty rather than an appropriate measure of damages, thereby precluding this Court from granting summary judgment.  This argument is trivial, at best, and Durney appears to be relying on the incorrect and outdated summary judgment standard he offered the Court in his response to

20

this Motion.  The correct standard is not what a "jury might decide," but rather what a reasonable jury could find.  *Liberty Lobby, Inc.*, 477 U.S. at 252.  As noted, the liquidated damages provision is entitled to significant latitude and appears reasonable on its face in light of the circumstances, thereby shifting the burden to Durney to show otherwise.  Durney has provided no evidence showing the liquidated damages clause was unreasonable.

Durney further argues that Bluwav cannot be entitled to liquidated damages of $220,000, since Bluwav has not shown that it suffered damages consistent with that amount.  The Court finds Durney's characterization mistaken.  The difficulty in quantifying the amount of damages was precisely the reason why Durney and WaveCrest agreed to the liquidated damages provision.  Durney has provided no evidence to the contrary and his arguments must therefore fail.

Moreover, Durney claims that he immediately dismissed his 2009 Action against Bluwav and the amount of liquidated damages was thus unreasonable.  This argument is also without merit.  Durney filed the 2009 Action on March 27, 2009, and did not dismiss his claims against Bluwav until five months later, on August 22, 2009.  Durney also refused to dismiss the action with prejudice, and asserted the right to reinstate the claims at a later time.  WaveCrest specifically contracted and payed consideration for the right to be free from the threat of future claims by Durney, and therefore, the 2009 Action claims are exactly the sort precluded by the Settlement Agreement.[6]  As such, the Court finds that liquidated damages in the amount of $220,000 are reasonable in light of the circumstances.

### ii. Attorney's Fees and Costs

---

[6] More significant, Durney refused to concede that his claims against Bluwav in the 2009 Action were barred by the Settlement Agreement, and affirms he may reassert the claims at a later time. Yet, Durney voluntarily dismissed those claims for no apparent reason, except that "Bluwav objected."  The Court finds Durney's explanation questionable and highly unlikely given the multitude and recurrence of claims he has filed in this and other cases.

Bluwav is also entitled to reimbursement of attorney fees and other litigation costs related to defending itself in the 2009 Action and in the instant case to enforce the Settlement Agreement.  Section 11 of the Settlement Agreement provides:

> The prevailing Party in any action, suit, or other proceeding instituted to remedy, prevent, or obtain relief from a breach of this Settlement Agreement, or arising out of a breach of this Agreement, or arising out of or related to this Agreement, shall recover all of such Party's litigation expenses, including attorneys' fees, incurred in each and every such action, suit, or other proceeding, including any and all appeals or petitions.

Contractual attorney fee provisions are expressly authorized by California law. "Under Civil Code section 1717, where a contract provides that attorney's fees and costs shall be awarded to the prevailing party, 'then the party who is determined to be the party prevailing on the contract' is entitled to *reasonable* attorney's fees and costs.'" *Steinman v. Malamed*, 185 Cal. App. 4th 1550, 1562 (Cal. Ct. App. 2010) (emphasis added). *See also R. P. Richards, Inc. v. Chartered Constr. Corp.*, 83 Cal. App. 4th 146, 158 (Cal. Ct. App. 2000) ("Attorney fees can be awarded as costs to the prevailing party when authorized by contract.").

While the Court agrees that Bluwav is entitled to attorney's fees and costs, such relief must be reasonable.  *See Steinman,* 185 Cal. App. 4th at 1562.  Given that relatively small portions of the parties' briefs were dedicated to this issue, the Court will require supplemental briefing as to the amount of reasonable attorney's fees and costs incurred by Bluwav, as ordered below.

### VI. MOTION TO RESCHEDULE PRETRIAL CONFERENCE AND MOTION TO PRECLUDE FURTHER VEXATIOUS FILINGS

Given the Court shall grant Plaintiff's dispositive Motion for Summary Judgment, Defendant's Motion to Reschedule Pretrial Conference and Plaintiff's Motion to Preclude

Further Vexatious Filings by Defendant are thus rendered moot.  As such, no additional inquiry is required with respect to these Motions.

## VII. CONCLUSION

Accordingly, for the above reasons, IT IS HEREBY ORDERED that Plaintiff's Motions to Transfer [dkt 85], and to Vacate Voluntary Dismissal [dkt 86] are DENIED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment [dkt 69] is GRANTED.

IT IS FURTHER ORDERED that Defendant's Motion to Reschedule Pre-Trial Conference [dkt 87] and Plaintiff's Motion to Preclude Further Vexatious Filings [dkt 94] are dismissed as moot.

IT IS FURTHER ORDERED that Bluwav file, within 21 days of entry of this Opinion and Order, a supplemental brief as to the amount of reasonable attorneys' fees and costs incurred by Bluwav.  Durney may file a response within 14 days, to which Bluwav may file a reply within 7 days.  All such briefs must: 1) contain specific and accurate legal support, including pinpoint citations to authority relied on; 2) be no more than ten pages; and 3) comply with E.D. Mich. L.R. 5.1.  The supplemental briefing schedule is as follows:

| | |
|---|---|
| **Bluwav's Supplemental Brief Regarding Reasonable Attorneys' Fees** | November  28, 2011 |
| **Durney's Response Brief** | December  12, 2011 |
| **Bluwav's Reply Brief** | December 19, 2011 |

IT IS SO ORDERED.

Date:   November 7, 2011                         s/Lawrence P. Zatkoff
                                                U. S. DISTRICT COURT JUDGE